IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 25, 2020 Session

## STATE OF TENNESSEE v. ODELL GLASS

**Appeal from the Criminal Court for Knox County**
**No. 109941     Bob McGee, Judge**

_____

### No. E2019-00965-CCA-R3-CD
_____

The defendant, Odell Glass, appeals his Knox County Criminal Court jury convictions of possession of a firearm by a convicted felon, felony murder, and reckless homicide, challenging the admission of testimony from the medical examiner regarding muzzle distance, the admission of surveillance video, and the sufficiency of the convicting evidence.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Joshua Hedrick, Knoxville, Tennessee, for the appellant, Odell Glass.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; Charme P. Allen, District Attorney General; and Phillip Morton and TaKisha Fitzgerald, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Knox County Grand Jury charged the defendant via presentment with one count of possession of a firearm after having been previously convicted of a felony involving the use of violence, one count of possession of a firearm after having previously been convicted of a felony involving the use of force, one count of the possession of a firearm after having been previously convicted of a felony involving the use of a deadly weapon, first degree felony murder in the perpetration of burglary, first degree felony murder in the perpetration of attempted burglary, first degree felony

murder in the perpetration of theft, first degree felony murder in the perpetration of robbery, and first degree premeditated murder for the death of the victim, Michael Nolan.

James Walker testified that he and Avis Mills went to the Holiday Market in East Knoxville on January 3, 2017. Mr. Walker recalled that Mr. Mills went into the store, and when he returned to the car, Mr. Walker "heard numerous gunshots" and ducked down in his seat. As Mr. Walker began to back out of the parking lot, he saw "this red car come out, turn to the right. He hit the curve and it went up the street." At that point, a man named Juney Burdine asked Mr. Walker for "a ride up the street, because it was his friend, he said, that got shot." Mr. Walker drove Mr. Burdine to Hobby Car Repair Center ("Hobby's"). Once there, "Juney looked in the car and got back in the car with me and said, yeah, he been shot, so just take me back." Mr. Walker took Mr. Burdine back to Holiday Market, where Mr. Walker overheard Mr. Burdine tell Mark Nolan that his brother had been shot. Mr. Walker then left Holiday Market to go home but found his way "blocked off with police cars." He then drove "back down Martin Luther King and numerous police cars had got behind me." Thinking that the police cars wanted to get by him, he pulled into a parking lot. The police cars followed him, and several officers "pulled their guns on me and told me not to get out of the car." After sitting in the car for some time, he was taken to the police station, where he gave a recorded statement.

Mr. Mills testified that as he "was getting out of the car, about to go in the store," he "heard a gunshot, so I ducked down in front of the car." After the shooting stopped, Mr. Mills got up and saw a red car pull out of the parking lot across the street and drive toward Hobby's. Mr. Mills got back into Mr. Walker's car "and rode up the street. And then that's when I seen that car that was parked over there in the parking lot right there." He recalled that the driver was "just bent over the car like that in the front seat." At that point, Mr. Mills saw "the white guy. He was standing right there next to him trying to get his attention. My thing was, why he didn't just call the ambulance or the police or something like that to . . . try to help the man out." Mr. Mills said that he and Mr. Walker went to the police department to be questioned and then to Mr. Walker's house.

During cross-examination, Mr. Mills estimated that Mr. Burdine was out of Mr. Walker's car for five to 10 minutes but maintained that Mr. Burdine did not touch the victim's car and instead only "looked in the window to see if he was all right."

Charles Nichols, who "was buying some CDs in the parking lot where Myrl set up shop in his white car" "right across the street" from "Chipper Grimes place" and "probably 50 feet from" Hobby's, testified that he heard "gunshots, pop, pop, pop, pop. And once I hear that, I turn to where it was. I see a maroon car which a gentleman in it --

now, who I know was Nolan -- and then I see a grayish Audi pull from the car." The man in the maroon car "drove away," making a right out of the parking lot at "Chipper Grimes place."

Tim Hobby, the owner of Hobby's, was sitting in his van in the parking lot adjacent to Hobby's when he heard gunshots. He said that he "didn't pay no attention to them. You hear them over there all the time." Shortly thereafter, the victim, whom Mr. Hobby had known for several years, "pulled up beside me and actually put the car up in park, looked over at me and never said a word, just fell back. A few seconds went by and he raised back up." Mr. Hobby "thought [the victim] was having a seizure" because he could not see any blood. Mr. Hobby telephoned the victim's brother, Gary, and told him that "his brother was up there and something was wrong with him," but before Gary arrived, "someone pulled up and told me he had been shot . . . . And that was when I called Gary back and told Gary that." By that time, Mr. Hobby "could see the blood and see bullet casings in the car at that time. And then [the victim] died."

Athena Dalton, a nurse who participated in the victim's treatment, testified that the victim arrived at the University of Tennessee Medical Center at 3:58 p.m. with a single gunshot wound to the left thigh. He was immediately designated a "full alert" trauma, meaning that he was "very unstable." The victim had no pulse, and an ultrasound examination showed that "he had no cardiac motion at that time." The victim's pupils were not reactive. He was declared dead at 3:59 p.m. Ms. Dalton said that, based upon the location of the injury and the amount of blood loss, she "assumed that it was the femoral artery" and noted that "[a]ny kind of arterial injury normally is potentially fatal."

Timothy Schade, who worked for the Knoxville Police Department ("KPD") in the forensic unit at the time of the shooting, testified that he collected evidence and took photographs during the search of a house at 2315 Chester Drive. He also collected evidence from and took photographs of a silver Audi A4 in the KPD impound lot. From the Chester Drive residence, Mr. Schade collected an LG cell phone; a black wallet containing an ID, insurance card, a pawn ticket, and half of a white pill; a .45-caliber ACP pistol and two magazines; and a "Fresenius medical care bag, with earbuds, blanket, gray shirt, a white/aqua-striped shirt and paper."

Investigator Brandon Wardlaw, who conducted the investigation with his partner, Investigator Jeff Day, testified that when the investigation led them to a Pilot store near the intersection of Northshore and Papermill, he contacted the legal department to obtain the video surveillance from that store.

Investigator Day testified that he responded to the scene and drove directly "to where the victim's car was at Hobby's." By the time he arrived, the victim had

already been transported to the hospital. Investigator Day then drove to the parking lot across from the Holiday Market where other officers and witnesses had congregated. He instructed a patrol officer to take the witnesses to the police department for questioning. He also arranged for the securing of video surveillance from the nearby buildings.

When he returned to the police station, Investigator Day interviewed Mr. Walker and Mr. Mills. Between the two interviews, he learned that the surveillance footage showed "the victim's vehicle sitting in the parking lot and then the silver Audi pulling up and stopping, suspect getting out, the incident taking place, him leaving." Based upon this information, the KPD issued a "BOLO" for the silver Audi. A short time later, Investigator Day learned that officers had stopped that vehicle. The driver of the vehicle, Casey Woodley, was transported to the police station. Before Investigator Day had the opportunity to interview Ms. Woodley, Akeva Dixon, Ms. Woodley's sister and the owner of the silver Audi, arrived at the police station. Apparently, Ms. Dixon had been to the scene, had learned that a silver Audi had been involved, and had gone to the police station to "ask us what was going on, in terms of what we knew, and she also wanted to apprise us with information about that vehicle."

Investigator Day testified that the date stamp on the surveillance video showed that the video recording was taken on January 3, 2017, but that "[t]he time appears to be off," which he said was "somewhat normal" for surveillance videos. He said that the video showed the defendant approach the victim's car with his gun drawn and open the door. He testified that, based upon the other information he gleaned during his investigation, the video recording appeared to accurately capture the events of January 3, 2017.

After speaking to Ms. Woodley, Investigator Day attempted to locate the defendant by tracking his location via his cellular telephone. Later that evening, tracking information indicated that the cellular telephone linked to the defendant was located inside a duplex on Chester Drive. Because the tracking data did not provide sufficient information for the officers to discern which half of the duplex the defendant was in, they set up surveillance to "watch the street, watch the houses there to see if . . . any person matching that description for [the defendant] would show up." In the meantime, officers obtained video surveillance footage from the Pilot station where Ms. Woodley worked. That footage showed the defendant driving the Audi while wearing the same clothing worn by the shooter in the surveillance video. Officers arrested the defendant on the following day at 2315 Chester Drive. After the defendant was transported to the police station, officers asked the defendant's girlfriend, Latara Moore, if they could search the residence, and she agreed. In addition to the items collected by Mr. Schade, Officers discovered a piece of mail bearing the defendant's sister's name along with a credit card bearing the defendant's name inside the residence. Investigator Day examined the gray

-4-

shirt collected from 2315 Chester Drive and said that the shirt "appears to be exactly the same as the one in the video of the shooting."

Investigator Day interviewed the defendant, and an audio recording of that interview was played for the jury.

In the interview, the defendant initially claimed that he did not know why he had been arrested and claimed to have been home until 4:00 p.m. on the day of the shooting. He also initially claimed that he "knew of" the victim but "didn't know him personally." After being confronted with the surveillance footage, witness statements, and cellular telephone location information, the defendant acknowledged having shot the victim. He said that the victim was armed with "a 380 or a nine" millimeter handgun and "either he threw it or got rid of it or something." The defendant explained that he had paid the victim "like $2,500" for "like 50 Opanas" that he later learned were "fake." The defendant used another person's telephone to call the victim to complain, and the two got into an argument over the telephone. The victim "aggressively" told the defendant "to pull up on MLK." "As soon as I pull up, I seen him like reaching, so I run up to the car. I'm not trying to kill this man at all. Period." The defendant said that he believed the victim was going to give him his money back, but he said that the victim "was talking s***." The defendant said that he "hit him in the leg" specifically because he was not trying to kill the victim. The victim then threw some money out the window, "but it wasn't nothing but like some $70." The defendant demanded the remainder of his money. The defendant said that he fired two shots, aiming both at the victim's legs. He said that he did not initially believe reports that the victim had died.

Investigator Day testified that he "could find no correlation, no connection between the defendant's phone and the victim's. There w[ere] no calls to or from the victim and [the defendant] on that day." The results of the forensic examination established that the defendant "had used his phone several, several times before the shooting and after," but Investigator Day was unable to corroborate the defendant's claim about a phone call of some kind from the victim.

During cross-examination, Investigator Day acknowledged that it was possible that the defendant used more than one telephone. Investigator Day admitted that although only one cellular telephone was found in the victim's car, it was possible that he had a second cellular telephone.

Investigator Day said that the evidence established that two shots were fired; one bullet was recovered from underneath the driver's seat and was likely the shot that went through the victim's leg, and the other bullet was found lodged in the door seal. He said that the trajectory of the bullet indicated that "the gun had to be elevated" but

clarified that "[t]he angle of that bullet was not vertical, but probably close." The first bullet either "goes through the window or his hand is through the window," but "[y]ou can't see it on the video." He said that "the second shot -- or the shot into the door had to be with the door open, obviously." He admitted that it would be difficult to glean much regarding the position of the gun from the location of the spent casing inside the car because it could have struck something inside the car before landing. Investigator Day acknowledged that a number of people, including the friends and family of the victim, arrived on the scene before the police and emergency personnel.

Tennessee Bureau of Investigation ("TBI") Special Agent and Forensic Scientist Laura Hodge testified as an expert in firearms identification. In this case, she received a firearm and magazines, two fired cartridge cases, and 21 unfired cartridge cases from the KPD. "Both magazines are what I call an aftermarket magazine. This is not the magazine that the manufacturer intended to have with this gun." One magazine was designed to hold eight cartridges, and the other was designed to hold 15 cartridges. Agent Hodge "was able to determine that the two cartridge cases . . . had been fired from" the handgun collected from 2315 Chester Drive. She testified that "[t]he cartridge cases will eject on the right side of the pistol" and that "this particular pistol, when I test-fired it, the cartridge cases went from 4 to 12 feet at three o'clock. That means I'm holding the firearm at a twelve o'clock position firing it. The cartridge cases go out at three o'clock."

During cross-examination, Agent Hodge said that she did not recall if the cartridge case traveled in "an arch or if it was straight out" when expelled. Agent Hodge said that the TBI had conducted "muzzle-to-garment distance testing" in other cases but had not been asked to do so in this case. She said that by examining a garment "microscopically, visually and chemically, if there's powder present, then I can take the firearm that was identified as being used and the same type of ammunition and conduct test patterns, and I could give a range." She said that, "[t]ypically, for reporting, a range could be greater than contact, less than 36 inches." She said that it would be necessary to have the same garment, firearm, and ammunition to arrive at an accurate estimate "[b]ecause manufacturers use different powders . . . and bullets, even. So you . . . must have all three components to do it as accurately as possible." She said that she could not have conducted muzzle-to-garment testing in this case because she did not have the clothing that the victim was wearing.

During redirect examination, Agent Hodge reiterated that muzzle-to-garment testing could not provide an exact distance but would give a range of "greater than contact, less than 36 inches." She said that "[t]he typical maximum distance at which gunshot residue will deposit on clothing is typically four to five feet." She agreed that "[w]ith minor action, with medical examiners, yes, they are able to make [the

muzzle-to-garment] determination when they do the autopsy."

Knox County Chief Medical Examiner Doctor Darinka Mileusnic-Polchan, who testified as an expert in forensic pathology, conducted the autopsy of the victim and determined that the "cause of death . . . was gunshot wound of left thigh, which severed the femoral vessels and caused exsanguination." She said that the bullet traveled "from left to right, slightly front to back and it's just about . . . an inch and a quarter downward, very, very minimal downward, almost straight." The bullet "completely dissected" "the femoral artery and the femoral vein," which would have resulted in a wound "that would bleed in a kind of gushing manner" and that would result in the presence of "a lot of arterial blood at the scene." She observed that, given the location of the wound, "it would be hard to stop the bleeding, even if one had a tourniquet available at the time." She said that the victim would have died within a matter of minutes, "ten minutes max."

Doctor Mileusnic-Polchan testified that the regular shape of the wound indicated that "there's really no barrier between the gun and . . . the thigh, except for the clothing." She said that she could "basically categorize wounds in three major categories" based upon the position of the wound and the "deposit of soot or gunpowder on the body or on the clothes." In this case, because the victim wore several layers of clothing at the time of the shooting, she "concentrate[d] on the clothing item" to look for the presence of soot or gunpowder. She identified a "two-inch span, where this spread of burned and unburned gunpowder happened" on the victim's jeans. She also observed an area on "the inner part of the pocket" that appeared as "kind of almost like a burn and gunpowder deposit on the" hole caused by the bullet. Based upon these findings, Doctor Mileusnic-Polchan classified the victim's wound as a "close-range gunshot wound." She opined that "based on the density, not knowing much about the gun, is that it's very dense; it's coming all the way to the jeans; it burns the pocket underneath, so it has to be less than one foot." She clarified that she could not narrow the distance any further without ballistics testing.

During cross-examination, Doctor Mileusnic-Polchan agreed that the type of gun and ammunition would affect the amount of gunpowder and soot produced. She said that ballistics testing could have been performed in this case because "you have the actual gun and you have the actual ammunition that is identical to the one used at the scene" and that, had such testing been done, she "could tell you this is between five to six or nine inches." Doctor Mileusnic-Polchan did not calculate the angle of entry of the bullet in degrees, did not measure the door of the car or the distance between the top of the victim's leg and the bottom of the window, and did not know the exact position of the victim's feet inside the car.

Based on this evidence, the jury convicted the defendant as charged of

possessing a firearm after having been convicted of a felony and felony murder. As to count eight, which charged premeditated first degree murder, the jury convicted the defendant of the lesser included offense of reckless homicide. The trial court merged the convictions as required by double jeopardy principles,[1] and, following a sentencing hearing, imposed a sentence of life plus eight years' incarceration.

In this appeal, the defendant challenges the admission of Doctor Mileusnic-Polchan's testimony regarding muzzle distance and the surveillance video depicting the shooting. He also challenges the sufficiency of the convicting evidence. We consider

---

[1]     Despite that the three firearm counts rely on the same two predicate offenses and allege a violation of the same exact statue, Code section 39-17-1307(b)(1)(A) ("A person commits an offense who unlawfully possesses a firearm, as defined in § 39-11-106, and . . . [h]as been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon . . . ."), the State chose to break up what was, in reality, a single offense in violation of a solitary statutory provision into three distinct counts of the presentment. Additionally, the State broke the single charge of felony murder into five counts, including separate counts charging murder in the perpetration of "any burglary," one in the perpetration of burglary and one in the perpetration of attempted burglary. The improper charging of the same offense in more than one count of an indictment results in multiplicity, the evils of which "are two-fold." "[M]ultiplicity may carry the potential of unfair prejudice, such as suggesting to the jury that a defendant is a multiple offender or falsely bolstering the state's proof on such issues as the defendant's motive or knowledge of wrongdoing" and "can lead to multiple convictions and punishment for only one offense." *State v. Whitmore*, No. 03C01-9404-CR-00141, 1997 WL 334904, at *9 (Tenn. Crim. App., Jackson, June 19, 1997) (citing *State v. Desirey*, 909 S.W.2d 20, 27 (Tenn. Crim. App. 1995) (citations omitted)). The second problem, the potential for multiple punishments, can be cured by a merger of offenses. As to the first problem, however, even though "multiplicitousness never places a defendant in jeopardy of multiple sentences, the prolix pleading may have some psychological effect upon a jury by suggesting to it that defendant has committed not one but several crimes." *United States v. Mamber*, 127 F. Supp. 925, 927 (D. Mass. 1955); *see also, e.g.*, *United States v. Sue*, 586 F.2d 70, 71-72 (8th Cir. 1978). We can fathom no legal reason that compels the decision to break apart the offenses in this way. Indeed, Code section 40-13-202 requires that an indictment "state the facts constituting the offense in ordinary and concise language, *without prolixity or repetition*, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court . . . to pronounce the proper judgment." T.C.A. § 40-13-202 (emphasis added). We also observe that excessive multiplicity, even when it does not violate double jeopardy principles or unfairly prejudice the defendant, increases the potential for error and juror confusion and unnecessarily consumes valuable judicial time and resources. For example, had the State elected to simply charge the defendant with felony murder in the perpetration of burglary, sufficient evidence of either a completed or attempted burglary would have been sufficient to support the conviction. *See generally State v. Swett*, No. M2011-00439-CCA-R3-CD, 2013 WL 53993, at *16 (Tenn. Crim. App., Nashville, Jan. 4, 2013). Given that the evidence easily supports a conclusion that the defendant murdered the victim during the perpetration of at least an attempted burglary, significant judicial resources could have been saved both at trial and on appeal. Instead, the State's charging decision resulted in the devotion of a significant amount of time and resources to the issue whether the defendant actually entered the victim's car as that term is used in Code section 39-14-402, a determination that is, in the grand scheme of things, entirely unnecessary to a conviction of first degree felony murder in the perpetration of "any burglary."

each claim in turn.

## I. Admission of Doctor Mileusnic-Polchan's Testimony

The defendant first asserts that the trial court erred by permitting Doctor Mileusnic-Polchan "to offer an opinion regarding muzzle distance without fulfilling its gatekeeping role."

On appeal, the defendant argues that, when he objected to Doctor Mileusnic-Polchan's testimony regarding muzzle distance, the trial court should have evaluated the methodology employed by Doctor Mileusnic-Polchan to determine "whether those methods were sufficiently reliable" to support the admission of her opinion. The defendant contends that the trial court's ruling that the challenge to the methodology "goes to the weight of the evidence and not its admissibility turns *McDaniel* and its progeny on its head."

The admissibility of expert testimony is governed by Tennessee Rules of Evidence 702 and 703 of the Tennessee Rules of Evidence. *See generally McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703, which focuses on the reliability of expert opinion testimony, states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. R. 703.

Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent clear abuse of that discretion. *See State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2010); *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404 (citing *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

As indicated, the defendant attacked the methodology behind Doctor Mileusnic-Polchan's testimony about the muzzle-to-garment distance in this case. Our supreme court, in *McDaniel*, identified a list of factors "[t]o assess methodological and foundational reliability":

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*Scott*, 275 S.W.3d at 403-04 (citing *McDaniel*, 955 S.W.2d at 265). The court cautioned, however, that "[r]igid application of these factors is unnecessary" and that "[n]ot all expert testimony will 'fit' with these factors." *Scott*, 275 S.W.3d at 404 (citing *Copeland*, 226 S.W.3d at 302; *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 277 (Tenn. 2005)). Importantly, however, the trial court "must assure itself that the opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation," keeping "in mind that the preliminary question . . . is one of admissibility of the evidence" as determined "within the framework of rules 702 and 703." *McDaniel*, 955 S.W.2d at 265 (citation omitted).

During the State's direct examination of Doctor Mileusnic-Polchan, the defendant objected

> to the muzzle distance as being outside the scope of the qualifications we've discussed previously and for what she's been admitted. If we're going to talk about the distance of muzzle to wound, I would suggest that the methodology she

used, unless she used test patterns, is not an acceptable methodology.

He argued that Doctor Mileusnic-Polchan had previously testified in an unrelated case that "you have to have test patterns in order to make that determination." The State argued that she was qualified to offer the testimony "as a forensic pathologist and an anatomic pathologist." The defendant argued that "at a minimum, if you're going to accept it, I'm entitled to engage in voir dire about the validity of the methods used." The court overruled the objection, concluding "that this objection goes to the weight of the evidence rather than the admissibility. I'll allow it to be presented. Certainly, it will be subject to your cross-examination on the very issue you've raised."

Although the trial court did not make an explicit ruling on the validity of the methodology employed by Doctor Mileusnic-Polchan, its ruling that the nature of the defendant's objection impacted the weight of the evidence rather than its admissibility necessarily included an implicit conclusion that her opinion was based upon a valid methodology. Importantly, that Doctor Mileusnic-Polchan did not employ the same methodology as that described by Agent Hodge does not, ipso facto, lead to a conclusion that the methodology employed by Doctor Mileusnic-Polchan was invalid. Doctor Mileusnic-Polchan testified that she had been trained to assess the muzzle-to-target distance when conducting autopsies and that she included her conclusions in each of the autopsies she performed on gunshot wound victims. She explained the method she used generally and explained how she used that methodology to arrive at her conclusion in this case. Under these circumstances, we agree with the trial court that the fact that Doctor Mileusnic-Polchan did not employ the same methodology as Agent Hodge and did not engage in any test firing would impact the weight of her conclusions regarding the muzzle-to-target distance in this case and not the admissibility of her opinion on the subject. Moreover, given the overwhelming proof of the defendant's guilt in this case, the admission of this evidence, even if erroneous, was harmless.

## II. Admission of Surveillance Video

The defendant next contends that the trial court erred by admitting into evidence surveillance video that "purported to show the incident in question" via a witness who lacked the firsthand knowledge necessary to authenticate the video.

During Investigator Day's direct examination testimony, he began describing what he saw when he viewed video surveillance footage from the scene of the shooting. The defendant objected on best evidence and authentication grounds. He argued that "we don't have any authentication that this is, in fact, a recording of this incident. Right? 'Cause we've got nobody to come in and say that this video is a video

of this incident." He also argued that "it's a best evidence problem" because "[t]he contents of the recording are proved by the recording." He asserted that the officer's "saying it appears that he's entering the car, it appears this, it appears that. Those are, to some extent, his judgments of what he sees based on watching the video." The court agreed that "the best way to proceed is to introduce that video through this witness and allow him to describe it, narrate it for the jury as he goes." The court also indicated an intent to "instruct the jury that it is the video and not the officer's interpretation that is evidence." At that point, the defendant reiterated his authentication objection to the video's admission via Investigator Day, arguing that Investigator Day did not have "sufficient knowledge to say that this is a fair and accurate depiction of those events." He noted that the officer was not present at the location when the events occurred and had no knowledge of the recording system. The State argued,

> [A]ll we've got to establish, we believe, is for the officer to testify that looking at this video, he can identify this defendant pulling out a gun -- or having a gun and shooting the victim. He can do that. We don't have to have the owner of the video. It's just that this . . . officer can identify the location and the defendant committed a crime.

The trial court sustained the objection as to best evidence but overruled the objection "based on capacity to the authentication." Before the video recording was played for the jury, the trial court instructed the jury as follows:

> Ladies and gentlemen of the jury, the State is now going to introduce into evidence a video that's already begun. The witness is going to describe what he believes is happening in the video. The evidence is the video. In this particular situation, . . . the witness's statements about his interpretation of the video are not actually evidence. They are intended to help you understand the evidence . . . if you want to use it for that purpose, but that's not the evidence. The evidence is the video. And you'll make up your own mind about what you see or don't see.

Tennessee Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). "Authentication can be properly established by the testimony of a witness with knowledge that the 'matter is what it is claimed to be.'" *State v. Mickens*, 123 S.W.3d 355, 376 (Tenn. Crim. App.

-12-

2003) (citing Tenn. R. Evid. 901(b)(1)). Both Rule 901 and the common law designate the trial court as the "arbiter of authentication issues," and, accordingly, that court's ruling will not be disturbed absent a showing that the court clearly abused its discretion. *See* Tenn. R. Evid. 901, Advisory Comm'n Comments; *Mickens*, 123 S.W.3d at 376. An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006), *overruled on other grounds by State v. Patterson*, 564 S.W.3d 423, 433 (Tenn. 2018); *see State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

The defendant argues that because Investigator Day was not present at the scene and had no knowledge about the origin of the allegedly erroneous time stamp, he could not properly say that the video recording was actually a video recording of the offense. That is not what the rule requires. To be sure, Rule 901 provides that authentication may be made by the testimony of a witness with knowledge that "a matter is what it is claimed to be." Tenn. R. Evid. 901(b)(1). In this case, Investigator Day, importantly testified that he reviewed the video surveillance footage and that the video recording being offered into evidence was the same recording. That he could not say with certainty that the video recording actually captured the offense in progress or vouch for the accuracy of the time stamp was irrelevant to the determination whether the recording was properly authenticated under Rule 901; it was enough that Investigator Day testified that the recording was what it purported to be, the surveillance video collected on the day of the offense.

Moreover, Rule 901 provides that the testimony of a witness with knowledge is but one in a list provided "[b]y way of illustration only, and not by way of limitation." *Id.* Also included in the illustrative list is the ability to authenticate a matter using "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." *Id.* at (b)(4). Here, Investigator Day was familiar with the location of the offenses, the vehicles involved, the description of the perpetrator and his clothing, and the basic facts of the case. In consequence, he could ascertain whether the actions depicted in the video aligned with the information he had gleaned about the offense from his investigation and could, as a result, authenticate the video recording.

### III. Sufficiency

Finally, the defendant asserts that the evidence was insufficient to support his convictions of felony murder.

-13-

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

### Felony Murder in the Perpetration of Burglary

The defendant argues that the evidence was insufficient to support his conviction of felony murder in the perpetration of a burglary because no evidence conclusively established that the defendant actually entered the victim's car. The State asserts that the jury could have inferred from the position of the defendant's body on the surveillance video, the presence of the cartridge casing in the passenger's side floor board, and the angle of the gunshot wound that the defendant's hand was inside the victim's car when he fired at least one of the two shots in this case.

Felony murder, as charged in this case, is "[a] killing of another committed in the . . . attempt to perpetrate any . . . burglary." T.C.A. § 39-13-202(a)(2). Burglary, as is applicable here, occurs when a person, "without the effective consent of the property owner . . . [e]nters any . . . automobile . . . with intent to commit a felony, theft or assault or commits or attempts to commit a felony, theft or assault." *Id.* § 39-14-402(a)(4). As used in Code section 39-14-402, "'enter means . . . (1) Intrusion of any part of the body; or (2) Intrusion of any object in physical contact with the body or any object controlled by remote control, electronic or otherwise." *Id.* 39-14-402(b)(1)-(2). "Clearly, under this statutory definition, the crime of burglary is complete when entry has been made into an automobile without the owner's consent and with an intent to commit a felony, theft, or assault." *State v. Ralph*, 6 S.W.3d 251, 255 (Tenn. 1999) (citing *State v. Lindsay*, 637 S.W.2d 886, 889 (Tenn. Crim. App. 1982)).

In his statement, the defendant acknowledged that he went looking for the victim on the day of the shooting, allegedly to recoup $2,500 that the victim owed him, and that he intentionally shot the victim, albeit because he thought the victim was reaching for a gun. The surveillance footage showed the defendant approach the victim's car with his gun drawn and, at one point, open the door of the victim's car. One cartridge

-14-

casing was found inside the victim's car. Agent Hodge testified that casings ejected at a right angle to the right side of the gun used to shoot the victim. From this evidence, a rational trier of fact could have concluded that the defendant's hand or the gun entered into the passenger compartment of the victim's car and that it was accompanied by the intent to commit a felony, theft, or assault.

*Felony Murder in the Perpetration of Theft/Robbery*

The defendant contends that the evidence was insufficient to support his conviction of felony murder in the perpetration of a theft or robbery because the State failed to establish that the defendant intended to take anything from the victim before deciding to shoot him.

Before a killing will "fall within the definition of felony murder, [it] must have been 'done in pursuance of the unlawful act, and not collateral to it.'" *State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Rice*, 184 S.W.3d 646, 663 (Tenn. 2006) (quoting *Farmer v. State*, 296 S.W.2d 879, 883 (1956))). "In other words, 'The killing must have had an intimate relation and close connection with the felony . . . , and not be separate, distinct, and independent from it [.]'" *Farmer*, 296 S.W.2d at 883 (quoting *Wharton on Homicide*, § 126 (3rd ed.)); *see also, e.g.*, *Banks*, 271 S.W.3d at 140; *State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005). To satisfy the requirement of "an intimate relation and close connection," "the killing 'may precede, coincide with, or follow the felony and still be considered as occurring "in the perpetration of" the felony offense, so long as there is a connection in time, place, and continuity of action'" *Thacker*, 164 S.W.3d at 223 (quoting *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999)).

> The res gestae embraces not only the actual facts of the transaction and the circumstances surrounding it, but also the matters immediately antecedent to the transaction and having a direct causal connection with it, as well as acts immediately following it and so closely connected as to form in reality a part of the occurrence.

*State v. Patrick Wingate*, No. M1999-00624-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Nashville, May 25, 2000) (citing *Payne v. State*, 406 P.2d 922, 925 (Nev. 1965)). Although "the 'intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim,'" the trier of fact "may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing.'" *Thacker*, 164 S.W.3d at 223 (quoting *Buggs*, 955 S.W.2d at 107-08). "Proof that such intent to

-15-

commit the underlying felony existed before, or concurrent with, the act of killing is a question of fact to be decided by the jury after consideration of all the facts and circumstances." *Buggs*, 995 S.W.2d at 107-08 (citing *Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973); *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

As indicated, the defendant admitted that he intended to confront the victim about the money the victim owed him. The surveillance footage showed that the defendant was armed when he encountered the victim, corroborating the defendant's statement that he armed himself and went to confront the victim. The defendant also admitted that the victim thrust $70 at him. The surveillance video captured the defendant picking something up from the ground, and no money was discovered in or near the victim's vehicle. The jury, as the trier of fact, was free to reject the defendant's claim that the victim owed him money and that the victim reached for a gun. In our view, this evidence was sufficient to support the defendant's convictions of felony murder in the perpetration of either robbery or theft.

*Conclusion*

Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE